## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MIDNIGHT PASS SOCIETY, INC.,
et al,

      Plaintiffs,

vs.                                  CASE NO. 8:12-cv-1314-T-17TBM

FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
et al,

      Defendants.

_____/

### ORDER

This cause comes before the Court on the following motions: (1) Defendant Sarasota County's Motion to Dismiss the Complaint, or Alternatively For a More Definite Statement, and Request for Judicial Notice (Dkt. 8); (2) Florida Department of Environmental Protection and Herschel Vinyard's Motion to Dismiss (Dkt. 13); and (3) Deputy Director Danielle Fondren's Motion to Dismiss Plaintiff's Complaint (Dkt. 14).  For the reasons discussed below, the Court grants all three motions, without prejudice for the Plaintiffs to amend the complaint consistent with the terms of this order.

### BACKGROUND

This case arises out of certain actions taken nearly thirty years ago to fill in and close an inlet pass in Sarasota County, Florida, which was commonly referred to as Midnight Pass. (Dkt. 1, ¶ 1).  Syd Solomon and Pasco Carter, Jr., the owners of the two Siesta Key residences, successfully lobbied the Florida Department of Environmental Protection (the "Department") and

Sarasota County officials to fill the inlet pass in order to prevent additional beach erosion that was threatening to destroy their homes. (Dkt. 1, ¶¶ 1, 24). In 1983, Sarasota County, the Department, and the Army Corps of Engineers (the "Corps") granted permission to close the pass and the State of Florida issued a coastal construction permit on an emergency basis pursuant to section 161.04 of the Florida Statutes. (Dkt. 1, ¶ 24). Permission to close Midnight Pass was allegedly conditioned on reopening the inlet pass once Messrs. Solomon and Carter stabilized their properties. (Dkt. 1, ¶¶ 25). Midnight Pass was filled with spoil and sand to close the inlet pass and prevent additional erosion of the beachfront properties. Plaintiffs sued nearly every conceivable federal and state actor in the process because "the defendants did not compel them to abide by the agreement" to reopen Midnight Pass. (Dkt. 1, ¶¶ 1, 25). Notably, Messrs. Solomon and Carter are not parties to this action.

Plaintiffs acknowledge that Sarasota County did attempt, albeit unsuccessfully, on several occasions to reopen the inlet pass. Three years after Midnight Pass was originally closed, in 1986, Sarasota County adopted a resolution that the reopening of Midnight Pass was in the local public interest and two years later, in 1988, applied for a permit to reopen the inlet pass.[1] (Dkt. 1, ¶ 26). The Department issued a notice of intent to deny the application, which Sarasota County challenged, and a formal hearing was held on October 15, 1990. (Dkt. 1, ¶ 27). The Department ultimately adopted the hearing officer's recommendation and denied the permit application on April 4, 1991. (Dkt. 1, ¶ 28). Again, in 2004, Sarasota County applied to the Department for a Joint Coastal Construction Permit. (Dkt. 1, ¶ 29). The Department and the Corps were allegedly responsible for reviewing and either granting or denying the application for the permit to excavate and reopen Midnight Pass. (Dkt. 1, ¶ 29). Finding that reopening the inlet would cause

---

[1] No plaintiff in this action was a co-applicant in the permit application process.

significant harm to the then existing coastal structure, the Department again issued a notice of intent to deny the application. (Dkt. 1, ¶ 31).  Plaintiffs take issue with Sarasota County's failure to object to the notice and proceed to an administrative hearing, choosing instead to withdraw its application. (Dkt. 1, ¶ 32).  Plaintiffs also disagree with the Corps' failure to initiate an Environmental Impact Statement on the application, process the application, and issue the dredge permit. (Dkt. 1, ¶ 33).

All of the Plaintiffs in this action ultimately seek, for commercial, environmental, and aesthetic reasons, to have Midnight Pass reopened.  Plaintiff Midnight Pass Society, Inc., is a non-profit Florida corporation, the members of which enjoy the recreational and aesthetic benefits of Little Sarasota Bay, Siesta Key, and the beaches surrounding Midnight Pass.  (Dkt. 1, ¶¶ 1, 16, 17).  Plaintiff Arthur Singleton is a resident of a condominium unit that runs adjacent to Midnight Pass and claims diminished use of the surrounding waters and a negative affect of the water quality as a result of closing Midnight Pass. (Dkt. 1, ¶ 18).  Plaintiff Steve Brannan is a resident of Sarasota County and claims that the closure of the inlet pass causes him to incur additional costs in navigating an additional fourteen miles to boat to the Gulf of Mexico. (Dkt. 1, ¶ 19). Plaintiff Vincent Plodzien owns beachfront property adjacent to Midnight Pass and claims that his beachfront property is eroding as a result of the altered process of sand replenishment resulting from closing Midnight Pass. (Dkt. 1, ¶ 20).  Plaintiff Turtle Beach Marina, LLC, operates a marina on Little Sarasota Bay near Midnight Pass and claims the closing of the inlet pass has reduced boat traffic and, consequently, harmed its business. (Dkt. 1, ¶ 21). Plaintiffs Turtles, Inc., and Ophelia's Restaurant, operate restaurants on Little Sarasota Bay and claim that the reduced boat traffic is also harming their businesses. (Dkt. 1, ¶ 22).  Plaintiff Randy Cornell is not a resident of Sarasota County, but rather a tourist from Tennessee who claims to spend less

3

vacation time in Sarasota County and the various plaintiff businesses in this lawsuit due to the reduction in water quality resulting from the closure of Midnight Pass. (Dkt. 1, ¶ 23).

To that end, Plaintiffs filed a five count complaint seeking only injunctive relief directing various agencies to issue permits to reopen Midnight Pass:[2]   (1) Count I alleges violations of the Clean Water Act ("CWA"); (2) Count II alleges violations of the Endangered Species Act ("ESA"); (3) Count III alleges violations of the dormant Commerce Clause of the U.S. Constitution; (4) Count IV alleges violations of the Equal Protection Clause of the U.S. Constitution; and (5) Count V alleges violations of the Administrative Procedure Act, 5 U.S.C. § 702, et seq.  The instant motions raise several procedural and substantive grounds for dismissal and each will be discussed in turn.

## DISCUSSION

### I. Insufficient Service of Process

Danielle Fondren, the Deputy Director for the Division of Water Resource Management of the Department, seeks dismissal of the complaint for, among other reasons, insufficient service of process. (Dkt. 14, p. 2).  The complaint and original summons lists Michael Barnett, in his official capacity as Chief of the Bureau of Beaches and Coastal Systems of the Department, as a defendant in this case. (Dkt. 1, § 11).  At the time process was served, however, Mr. Barnett no longer held that title; Deputy Director Fondren did.  Thus, the process server crossed out Mr. Barnett's name and served Deputy Director Fondren, the then Chief of the Bureau of Beaches and Coastal Systems.  In an official-capacity suit such as this, the real party in interest is the Bureau of Beaches and Coastal Systems. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

---

[2] "Plaintiffs do not seek damages or money to pay for the cost of reopening the Pass from either the State or Federal defendants." (Dkt. 1, p. 25).  Plaintiffs do seek compensation for reasonable attorneys' fees and costs of this litigation.

The current Bureau Chief of the Bureau of Beaches and Coastal Systems will, therefore, be substituted as the named Defendant in his or her official capacity. *See* Rule 25(d), Fed. R. Civ. P. All of this is moot because, as discussed below, Deputy Director Fondren, Mr. Barnett, and the currently unnamed official holding the title of Bureau Chief of the Bureau of Beaches and Coastal Systems are, or would have been, dismissed from this lawsuit based on Eleventh Amendment immunity grounds.

## II. Failure to Join an Indispensable Party

The Department, and Herschel Vinyard in his official capacity as Secretary of the Department, seek dismissal of the complaint pursuant to Federal Rule of Civil Procedure 19(b) for failing to join the Florida Board of Trustees of the Internal Improvement Trust Fund ("Board of Trustees") as an indispensable party.[3] (Dkt. 13, pp. 9-11). The Board of Trustees, according to the moving defendants, is a necessary party because the Department cannot issue a permit to dredge the inlet pass without approval by the Board of Trustees. The moving defendants suggest that because the Board of Trustees is necessary and indispensable, and because the Eleventh Amendment precludes joinder, dismissal is appropriate. The Plaintiffs clearly oppose the motion insofar as joinder would compel dismissal of the suit for lack of subject matter jurisdiction.

The Court finds that the Board of Trustees is not a necessary party to this litigation, although it is of no consequence. Assuming the Board of Trustees is the final decision maker in this process, as is likely the case,[4] the Court could have, if Plaintiffs prevailed and were entitled

---

[3] Deputy Director Fondren seeks dismissal of the complaint on the same grounds. (Dkt. 14). The Court will treat the motion as one filed by the current Chief of the Bureau of Beaches and Coastal Systems as the real party in interest.

[4] *See* Fla. Stat. §§ 253.77(1); *see also* Fla. Stat. § 373.427(2)(a) ("Unless waived by the applicant, within 90 days of receipt of a complete application, the department or water management district shall issue a recommended consolidated intent to grant or deny on all of the concurrently

to such relief, ordered the Department to issue a conditional approval of the permit application

subject to authorization by the Board of Trustees. *See generally Hollingsworth v. Dept. of*

*Environmental Regulation*, 466 So. 2d 383, 386 (Fla. 1st DCA 1985). The Board of Trustees

would have then been faced with exercising its authority to approve or deny the permit

application based on the conditional, court-ordered approval by the Department. In any event,

the issue is mooted by the Court's dismissal of the Department from this case.

## III. Eleventh Amendment Immunity

Plaintiffs here seek an injunction ordering the defendants to issue a permit to restore

Midnight Pass to its pre-1983 condition. Couched as federal constitutional and statutory

violations, the dispute nonetheless implicates the ownership rights of the beachfront properties

and the submerged lands of the inlet pass. Because the Eleventh Amendment extends to suits

based on diversity jurisdiction and suits grounded in federal-question jurisdiction alike, *Seminole*

*Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996), this Court is now faced with deciding whether

the doctrine of sovereign immunity bars the extant claims from proceeding in federal court. For

the present discussion, the Court will focus its analysis on the Department, the Department's

Secretary, Herschel Vinyard, and the currently unnamed Chief of the Bureau of Beaches and

Coastal Systems within the Department.[5] Plaintiffs in effect concede that the Department is an

---

reviewed application, and shall submit the recommended consolidated intent to the board of trustees for its consideration of the application to use board of trustees-owned submerged lands.") (emphasis added).

[5] Also pending is the federal defendants' motion to dismiss, based in part on Eleventh Amendment immunity. (Dkt. 33). The Court will enter a separate order on that motion, if the motion is not amended by the defendants at their behest. Sarasota County, for good reason, did not assert Eleventh Amendment immunity. *See Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1314 (11th Cir. 2005) (citing established precedent that counties are not afforded Eleventh Amendment immunity).

arm of the state, but argue instead that the Department waived its sovereign immunity by

cooperating with the federal government in joint enforcement of the Clean Water Act and the

Endangered Species Act. *See* (Dkt. 18, p.4). With regards to the state officials, Plaintiffs argue

that this case fits squarely within the *Ex parte Young* exception that permits actions to proceed

against state officials so long as they seek prospective injunctive relief to redress an ongoing

violation of federal law. The Court will address each in turn.

Sovereign immunity is, simply put, the privilege of a sovereign not to be sued without its

consent. *See Hans v. Louisiana*, 134 U.S. 1, 16-17 (1890). "The Eleventh Amendment

confirmed, rather than established, sovereign immunity as a constitutional principle; it follows

that the scope of the States' immunity from suit is demarcated not by the text of the Amendment

alone but by fundamental postulates implicit in the constitutional design." *Alden v. Maine*, 527

U.S. 706, 728 (1999). For that reason the Eleventh Amendment has been described as a

jurisdictional gatekeeper for federal courts as it "deals only with federal jurisdiction to hear suits

against the state, not with the state's immunity from suit in any forum." *Hufford v. Rodgers*, 912

F.2d 1338, 1340-41 (11th Cir. 1990) (internal citations omitted).

## A. The Department did not waive its Eleventh Amendment Immunity

Of course, "[a] State may waive its sovereign immunity at its pleasure, and in some

circumstances Congress may abrogate it by appropriate legislation."[6] *Virginia Office for the*

*Protection and Advocacy v. Stewart*, __ U.S. __, 131 S.Ct. 1632, 1638 (2011) (internal citations

omitted). "The decision to waive that immunity, however, is altogether voluntary on the part of

the sovereignty." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S.

---

[6] Congress may only abrogate a state's sovereign immunity when it acts under section 5 of
the Fourteenth Amendment. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 59 (1996).

666, 675 (1999) (quoting *Beers v. Arkansas*, 20 How. 527, 529 (1858)).  Generally, waiver only

exists if the state voluntarily invokes, or makes a "clear declaration" that it intends to submit

itself to the jurisdiction of the federal courts.  *Id.* at 675-76.  The Supreme Court momentarily

departed (for about four decades) from this notion of express waiver by crafting a constructive

waiver doctrine, so to speak, whereby a state can waive its Eleventh Amendment immunity

merely by regulating in a field with notice that it is subject to federal oversight and regulation

with a right to sue in federal court.  *Parden v. Terminal R. of Alabama Docks Dept.*, 377 U.S.

184, 192 (1964).  In overruling *Parden*, the Supreme Court held that the "constructive-waiver

experiment of *Parden* was ill conceived, and [saw] no merit in attempting to salvage any remnant

of it."  *College Sav. Bank*, 527 U.S. at 680.

Although *College Savings* held that a state's waiver of sovereign immunity is not

voluntary (thus, not a waiver in effect) where Congress made it a condition of the state's

participation in an otherwise lawful activity, it did not box out the idea that a state may implicitly

waive its sovereign immunity by accepting a "gift" or "gratuity" from Congress in exchange for

the state's waiver of sovereign immunity.  *Id.* at 687 (distinguishing two prior cases—*Petty v.

Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275 (1959) and *South Dakota v. Dole*, 483 U.S.

203 (1987)—and holding that "where the constitutionally guaranteed protection of the States'

sovereign immunity is involved, the point of coercion is automatically passed-and the

voluntariness of waiver destroyed-when what is attached to the refusal to waive is the exclusion

of the State from otherwise lawful activity").

Indeed, several circuits outside of ours have applied *College Savings* to find a waiver of

Eleventh Amendment immunity by accepting the "gift" of participating in a regulatory scheme.

*See, e.g., MCI Telecomms. Corp. v. Bell Atlantic Pennsylvania*, 271 F.3d 491, 513 (3d Cir. 2001)

8

("We hold therefore, along with the Fifth Seventh, and Tenth Circuits, that the PUC in subject to
suit in federal court under the 1996 Act because the PUC knowingly waived its Eleventh
Amendment immunity by voluntarily accepting the congressional gratuity of the power to
regulate local telecommunications."); *MCI Telecomms. Corp. v. Illinois Bell Telephone Co.*, 222
F.3d 323, 342 (7th Cir. 2000) (holding that states voluntarily waive sovereign immunity by
accepting the "invitation" to regulate the local telephone market in accordance with 47 U.S.C. §
252). Critically important to these decisions, all of which involved the statutory scheme of the
Telecommunications Act of 1996, the statute was sufficiently clear that any party aggrieved by a
state agency's determination under 47 U.S.C. § 252 "may bring an action in an appropriate
Federal district court to determine whether the agreement or statement meets the requirements of
section 251 of this title and this section." *MCI Telecomms.*, 222 F.3d at 341. Without even
expressing whether the Court agrees with those circuits that have reinvigorated the dying spirit of
*Parden*, it is not, in any event, appropriate to decide the issue by analogy to a statutory scheme
different than that which is involved in this case.

There is no decision that this Court can find regarding Eleventh Amendment immunity
with regards to the applicable provisions of the Clean Water Act or the Endangered Species Act.
Plaintiffs, however, in their response papers, seem to suggest there is case law from another
circuit. According to Plaintiffs, "[t]he Second Circuit held specifically that when a state receives
the benefit of participating with the federal government in the Clean Water Act, it waives
sovereign immunity, and cannot selectively opt out of the Act's provision allowing any citizen to
bring suit against any person, including any 'governmental instrumentality or agency,' to enjoin
violations of the Act." (Dkt. 18, p. 5). Much to the Court's disappointment, however, no citation
to this authority was provided. Through its own due diligence, the Court did discover a case in

9

the Second Circuit holding that a state, by regulating natural gas pipeline projects pursuant to the

regulatory schemes of the Natural Gas Act ("NGA") and the CWA, waives its sovereign

immunity for section 19(d) suits. *Islander East Pipeline Co., LLC v. Connecticut Dept. of

Environ. Protection*, 482 F.3d 79, 90 (2d Cir. 2006).  The Court does not join in Plaintiffs'

weighty reliance on this case (assuming this is even the case alluded to) because, to begin with,

the Second Circuit's holding must be limited to 19(d) suits—which this case is not. *See id.* at 91

("Accordingly, in this case, Connecticut knowingly and intelligently waived its Eleventh

Amendment immunity from section 19(d) suit.") (emphasis added).  Without any briefing from

the parties on the matter, the Court can readily conclude that section 19(d) does not apply to

permits to dredge a channel for an inlet pass, but rather to permits for, and construction of,

liquefied natural gas facilities (i.e., 15 U.S.C. § 717b) and interstate natural gas pipelines (i.e., 15

U.S.C. § 717f).[7]  *See* 15 U.S.C. § 717r(d)(1).  Like the cases dealing with the

Telecommunications Act of 1996, section 19(d) provides that original jurisdiction of disputed

permitting decisions lies with the federal district court.

   The Court does not find similar language in either the CWA or the ESA.  In fact, to the

contrary, Congress expressly states that suits pursuant to the CWA and the ESA are limited by

the Eleventh Amendment. *See* 16 U.S.C. § 1540(g) ("[A]ny person may commence a civil suit

on his own behalf to enjoin any person, including the United States and any other governmental

instrumentality or agency (to the extent permitted by the eleventh amendment to the

Constitution) . . .") (emphasis added); 33 U.S.C. § 1365(a) ("[A]ny citizen may commence a civil

---

[7] That Plaintiffs filed this suit in district court and not directly with the Eleventh Circuit is
further evidence that this is not a section 19(d) suit.  *Id.* (granting "original and exclusive
jurisdiction" to the United States Court of Appeals for the circuit in which the liquefied natural gas
facility or interstate natural gas pipelines facility is "proposed to be constructed, expanded, or
operated").

action on his own behalf against any person (including (I) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) . . .") (emphasis added). Plaintiffs' proposed resolution is not reconcilable with the Supreme Court's decision in *College Savings*, which held that mere notice that there is federal regulatory oversight and the right to sue in federal court is insufficient to voluntarily waive sovereign immunity. If the decision between the two is a binary one (and the Court thinks it is) the Supreme Court must win. Accordingly, the Court finds that the Department is immune from this litigation as an arm of the state pursuant to the Eleventh Amendment.

**B. The effect of this lawsuit on the State of Florida's current and future regulatory power over its submerged lands brings it outside of the *Ex parte Young* exception to Eleventh Amendment immunity.**

Plaintiffs are not necessarily left without a remedy against the state simply because the Department is entitled to sovereign immunity in federal court. In *Ex parte Young*, the Supreme Court carved an exception to Eleventh Amendment immunity and held that suits can lie for prospective injunctive relief against state officials when there is an ongoing violation of federal law. *Ex parte Young*, 209 U.S. 123 (1908). Generally, "in determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Virginia Office for Protection and Advocacy v. Stewart*, 131 S.Ct. 1632, 1639 (2011) (internal citations omitted). In most cases that is true. However, as the Supreme Court held in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997), the *Ex parte Young* exception is not applicable in instances when the effect, not the stated objective, of the lawsuit against the agency official is the "functional equivalent of a quiet title action which implicates special sovereignty interests." *Id.* It is a rare case indeed in

11

which this ordinarily straightforward question is supplanted by a necessary foray into the tangled morass of determining whether a suit implicates a special sovereignty interest of the state. This is such a rare case.

Given the similarities between *Coeur d'Alene* and the facts in this case, it seems prudent to engage in a basic review of the Supreme Court's reasoning. In that case, the Coeur d'Alene tribe (the "Tribe") sued the State of Idaho, several state agencies, as well as numerous state officials, to declare its entitlement to the exclusive use and enjoyment of certain submerged lands based on the original property boundaries defined in the executive order that established the Coeur d'Alene Reservation in 1873. 521 U.S. at 264-65. The Supreme Court had to determine the effect of the Tribe's lawsuit on the special sovereignty interests of the State of Idaho in maintaining authority over the beneficial ownership and control of real property interests of the state. Starting with the unassailable premise that the Tribe could not bring a quiet title action against Idaho in federal court, *id.* at 281-82 (citing *Tindal v. Wesley*, 167 U.S. 204 (1897)), the Supreme Court recognized that granting the injunction "is close to the functional equivalent of quiet title in that substantially all benefits of ownership and control would shift from the State to the Tribe." *Id.* at 282. The injunction would, in effect, prevent the State of Idaho, and its officials, from exercising any governmental authority over the disputed land and water, including submerged land. *Id.* Reaffirming its previous recognition that a state's ability to control its submerged lands is critical to its ability to use its navigable waters, and, thus, is "considered an essential attribute of sovereignty," *id.* at 283 (citing *Utah Div. of State Lands v. United States*, 482 U.S. 193, 195 (1987)), the Court tied its analysis to Idaho's expresses sovereignty interest in its submerged lands. *See id.* at 287 (citing *Poole v. Olaveson*, 356 P.2d 61, 65 (1960)) ("Title to these public waters is held by the State of Idaho in its sovereign capacity for the purpose of

12

ensuring that it is used for the public benefit."). Consistent with its holding in *Seminole Tribe*,

the Court avoided the empty formalism that would result if the focus was not trained on

determining the essential nature and effect of the proceeding. *See id.* at 272-77. Focused on the

effect on the State of Idaho, if the Tribe prevailed in its claim against the state officials, the Court

held that the state's "sovereign interest in its lands and waters would be affected in a degree fully

as intrusive as almost any conceivable retroactive levy upon the funds in its Treasury." *Id.* at

288.

This Court must be equally as mindful on the effect of this lawsuit on the State of

Florida's current and future regulatory power over its submerged lands. It is not surprising that

the parties disagree mightily on this point. According to the Department and Secretary Vinyard,

"the requested injunctive relief would divest the State of its sovereign control over submerged

lands." (Dkt. 13, p. 8). Plaintiffs maintain, on the other hand, that "the state will not be divested

of ownership or control of the submerged land under Midnight Pass[;] [i]t remains free to

regulate it in the future to the same extent it regulates other inlets." (Dkt. 18, p. 4).

Although not directly addressed in the papers submitted to the Court, it is beyond dispute

that the State of Florida considers the submerged lands underlying Midnight Pass to be

sovereign. When it became a state, in 1845, Florida received title to the lands beneath navigable

waters up to an including the ordinary high water mark incident to its status as a sovereign

separate and apart from the union. *Coastal Petroleum Co. v. American Cyanamid Co.*, 492 So.

2d 339, 342 (Fla. 1986). The Public Trust Doctrine is codified in the Florida Constitution:

> The title to lands under navigable waters, within the boundaries of the state, which
> have not been alienated, including beaches below mean high water lines, is held by
> the state, by virtue of its sovereignty, in trust for all the people. Sale of such lands
> may be authorized by law, but only when in the public interest. Private use of
> portions of such lands may be authorized by law, but only when not contrary to the
> public interest.

Art. X, § 11, Fla. Const. "Sovereignty lands are for public use, 'not for the purpose of sale or

conversion into other values, or reduction into several or individual ownership." *Coastal*

*Petroleum*, 492 So. 2d at 342 (quoting *State v. Gerbing*, 47 So. 353, 355 (1908)). To that end,

"[a] person may not commence any excavation, construction, or other activity involving the use

of sovereign or other lands of the state, the title of which is vested in the board of trustees of the

Internal Improvement Trust Fund under this chapter, until the person has received the required

lease, license, easement, or other form of consent authorizing the proposed use." *See* Fla. Stat. §

253.77(1). The Board of Trustees holds in trust for the people of the State of Florida all title to

state-owned property, which is why it is the Board of Trustees that hold the ultimate veto power

with respect to the regulation of coastal construction permits. *See* Fla. Stat. § 373.427(2)(a).

There is no reasonable construction of the allegations in the complaint that does not

implicate the immediate effect of the State of Florida's jurisdictional control over its public lands

should Plaintiffs prevail. The Department, as Plaintiffs allege, "through the Bureau of Beaches

and Coastal Systems, has the authority to regulate and issue coastal construction permits for the

excavation or dredging of inlet channels such as Midnight Pass." (Dkt. 1, ¶ 10). Also as

alleged, "the permit application process for the excavation of a previously existing inlet that has

been closed by human activity, such as Midnight Pass, requires that an application for a Joint

Coastal Permit be submitted to the FDEP Bureau of Beaches and Coastal Systems, which decides

on behalf of the State of Florida whether to issue the permit and forward to the U.S. Army Corps

of Engineers for issuance of a federal permit." (Dkt. 1., ¶ 43). The Plaintiffs are, in effect,

asking this Court to decide, by usurping the judgment of the Department and the Board of

Trustees, the riparian rights associated with the inlet pass formerly known as Midnight Pass. To

be sure, the Plaintiffs seek a declaratory judgment by this Court that the Department and its

14

officials are in violation of federal law by declining to issue a permit to reopen Midnight Pass and, consequently, enter an "order requiring them to issue the permits necessary to reopen Midnight Pass." (Dkt. 1, pp. 23-24 at ¶¶ A-C). Driving home the point that these claims are akin to a quiet title action is the fact that Plaintiffs rely on an alleged conditional agreement between the Department and the previous landowners to issue the permit in 1983 only if they later submitted a permit to reopen Midnight Pass once the beach property was stabilized. As a necessarily corollary to such an injunction, to ensure the continued beneficial enjoyment of the aesthetics, and qualitative benefit of increased water quality, in the area surrounding Midnight Pass, the Department would be prohibited from changing course subsequent to this Court's order and taking any action that would close Midnight Pass.

Focusing on the essential nature and effect of this proceeding, as this Court is obliged to do based on *Coeur d'Alene*, the Court concludes that this suit will effectively deprive the State of Florida from regulating its sovereign lands surrounding Midnight Pass. Deputy Director Fondren, Mr. Barnett, and the currently unnamed official holding the title of Bureau Chief of the Bureau of Beaches and Coastal Systems are entitled to Eleventh Amendment immunity based on the application of *Coeur d'Alene* to this case. To hold otherwise, would effectively render the judgment a nullity and strip the force of any judgment by this Court of any meaningful authority. By foreclosing a federal forum to litigate this dispute, however, Plaintiffs are not left without a remedy—they can bring this action in the appropriate Florida state court against the Department, the Board of Trustees, and any other agency or agency official they deem necessary. *See, e.g., Trustees of Internal Imp. Fund v. Claughton*, 86 So. 2d 775 (Fla. 1956) (quiet title action against the Board of Trustees to question the validity of title to certain submerged lands).

**IV. The "shotgun" complaint must be amended to conform to the current Rule 12(b)(6) pleading standard and to make clear which of the remaining defendants are being sued for each claim.**

A complaint that incorporates every antecedent allegation by reference into each subsequent claim for relief is a "shotgun pleading." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006). Shotgun pleadings take many forms, some of which are so vague and ambiguous that it is impossible for the defendant to even frame a response. Although this is not an example of the worst, the complaint in this case leaves much to be desired. By way of example, the complaint alleges five causes of action against thirteen named defendants. (Dkt. 1). Each of the five counts incorporates by reference the 43 general allegations of the complaint. (Dkt. 1, ¶¶ 44, 54, 64, 83, and 90). Such an approach can be manageable in certain instances, but not when the complaint asserts three statutory (including a claim pursuant to the Administrative Procedure Act) and two constitutional claims against thirteen different defendants. Even worse, Plaintiffs do not identify which defendants are being sued for which claim. Only after reading the moving papers, and Plaintiffs' clarifications in response, was the Court able to narrow the field with any degree of confidence. To countenance the shotgun pleading in this case would serve to unnecessarily proliferate a problem that is increasing the transaction costs of litigation for all litigants, as well as place a heavy burden on already strained judicial resources. That this Court will not do. Plaintiffs shall file an amended complaint that identifies which of the remaining defendants are being sued for which claims. Plaintiffs' counsel are on "notice" and are hereby advised to read the Supreme Court's not so recent iteration of Federal Rule of Civil Procedure 8 as it prepares the amended pleading.[8]

---

[8] In Plaintiffs' responses to the several motions to dismiss, it was suggested that a Rule 12(b)(6) motion "should be granted only when 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" (Dkt. 18, p. 1) (citing

**ORDERED** that Deputy Director Danielle Fondren's motion to dismiss in GRANTED IN PART and DENIED IN PART.  (Dkt. 14).  Deputy Director Fondren is entitled to Eleventh Amendment immunity and is, therefore, dismissed from this lawsuit.

**IT IS FURTHER ORDERED** that Florida Department of Environmental Protection and Herschel Vinyard's motion to dismiss is GRANTED.  (Dkt. 13).  The Florida Department of Environmental Protection and Secretary Vinyard are entitled to Eleventh Amendment immunity and are, therefore, dismissed from this lawsuit.  The Clerk of Court is directed to terminate the following parties from this case: the Florida Department of Environmental Protection, Secretary Herschel Vinyard, Michael Barnett, and Deputy Director Danielle Fondren.

**IT IS FURTHER ORDERED** that Defendant Sarasota County's motion to dismiss is GRANTED.  (Dkt. 8).  Plaintiffs shall have fourteen days from the date of this order to file an amended complaint consistent with the terms of this order.  The federal defendants may at their own behest file an amended response to the new pleading, or they may rely on the pending motion to dismiss currently pending before the Court.  (Dkt. 33)

**DONE AND ORDERED** in Chambers in Tampa, Florida this 26th day of March, 2013.


ELIZABETH A. KOVACHEVICH
United States District Judge

Copies furnished to: All Counsel of Record

---

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  It is astonishing, indeed truly disappointing, that a practitioner in federal court would be unaware of the Supreme Court's decisions in *Twombly* and *Iqbal* "retir[ing] the Conley no-set-of-facts test" for Rule 8(a).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 670 (2009).  The Court expects the amended pleading to reflect the pleading standards espoused by the Supreme Court in *Twombly* and *Iqbal*.